

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SABRINA BUSH,                              )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )        No. 07 C 5504
                                           )
MICHAEL J. ASTRUE, Commissioner            )        Judge Ruben Castillo
of the Social Security Administration,     )
                                           )
                    Defendant.             )

## MEMORANDUM OPINION AND ORDER

Sabrina Bush ("Plaintiff") brings this action for judicial review of the final decision of the

Commissioner of the Social Security Administration ("SSA") denying her application for Social

Security Insurance ("SSI") benefits.[1]  Presently before the Court are Plaintiff's motion for

summary judgment and her separate motion for remand based on new medical evidence. (R. 17,

Pl.'s Summ. J. Mot.; R. 20, Pl.'s Mot. to Remand.)  For the reasons stated below, this Court

grants in part and denies in part Plaintiff's motion for summary judgment, and grants the motion

for remand based on new medical evidence.

### RELEVANT FACTS

Plaintiff was born on November 2, 1975.  (A.R. 81.)[2]  She has an eleventh-grade

education and has held various jobs in childcare, stock work, packing, and housekeeping.  (A.R.

319-23.)  She applied for SSI benefits in July 2005, claiming that she became disabled and

---

[1] The SSI program provides benefits to low-income individuals who are blind, disabled, or age 65 or older.  *See* 42 U.S.C. § 1381 *et seq.*

[2] Citations to (R. ___.) refer to the record number that a document is assigned on the docket sheet for this case.  Citations to (A.R. ___.) refer to the administrative record of these proceedings, which was filed as entry number 10 on the docket.

unable to work in June 2004. (A.R. 81-83.)

## I. Medical Evidence

In July 2004, Plaintiff was admitted to the hospital with back problems. (A.R. 81-83, 156-60.) While in the hospital, she was diagnosed with pelvic inflammatory disease and underwent laparoscopic lysis of peritoneal adhesions and a total unilateral salpingectomy.[3] (A.R. 158-60, 163.) Hospital records indicate that Plaintiff's back pain may have been secondary to her pelvic problems, and that she also may have had gall stones. (A.R. 158-60.) A pelvic ultrasound revealed uterine abnormalities and multiple ovarian cysts. (A.R. 169.)

Throughout 2004 and 2005, Plaintiff complained to her treating physician, Dr. Darryl Woods, of abdominal and pelvic pain, headaches, difficulty sleeping, and back pain. (A.R. 192-95, 203.) Plaintiff's doctor noted that her back pain may have been related to her pelvic condition. (A.R. 203, 209.) He prescribed medication for her headaches and back pain, and recommended additional testing. (A.R. 193, 203.) Plaintiff's doctor also opined that Plaintiff may be suffering from depression, and prescribed Elavil. (A.R. 192.)

In June 2005, Plaintiff was treated in the emergency room for complaints of back pain. (A.R. 184-93.) The examining doctor observed some paraspinal tenderness in the thoracic area,[4]

---

[3] Laparoscopy is the examination of the contents of the abdomino-pelvic cavity with an instrument called a laparoscope, which is passed through the abdominal wall. *Stedman's Medical Dictionary* at 1047-48. Lysis involves the destruction of red blood cells, bacteria, and other structures by a specific antibody. *Id* at 1137-38. A salpingectomy is the removal of the uterine tube. *Id.* at 1715.

[4] Thoracic means "relating to the thorax." *Stedman's Medical Dictionary* at 1982. The thorax is the upper part of the trunk between the neck and the abdomen, formed by the 12 thoracic vertebrae, the 12 pairs of ribs, the sternum, and the muscles and fasciae attached to these. *Id.*

2

but subsequent testing revealed no abnormalities. (A.R. 183-87.)

From June 2005 to April 2006, Plaintiff reported to her doctor that she was experiencing low back pain radiating into her right leg, numbness in her hands, and poor vision. (A.R. 201-12.) Plaintiff also complained of numbness along with decreased strength and feelings of swelling in her right wrist and hand. (A.R. 206.) Dr. Woods ordered additional testing to determine whether Plaintiff had carpal tunnel syndrome, prescribed bracing for her right wrist, and continued to prescribe pain medication. (A.R. 206.)

Plaintiff visited her doctor again on November 14, 2006. (A.R. 256.) She had not completed the additional testing he had ordered. She nevertheless reported that she was still experiencing lower back and wrist pain. (A.R. 256.) The doctor observed abnormalities in Plaintiff's right hand, including reduced finger extension and hand grip, as well as abdominal tenderness and inability to toe walk. (A.R. 256.) He continued Plaintiff's pain medications, and again ordered additional testing of her back, hands, and eyes. (A.R. 256.)

## II. ALJ Hearing

On November 15, 2006, ALJ Michael R. McGuire conducted a hearing on Plaintiff's application for benefits. (A.R. 311-43.) Plaintiff was represented by counsel from the Chicago Legal Clinic.[5] (A.R. 77, 311.)

At the hearing, Plaintiff testified that she experienced constant pain in her back, which worsened when she sat for longer than 30 minutes to an hour. (A.R. 325.) She testified that she often had sharp pain radiating down into her right leg. (A.R. 335.) She testified that overhead

---

[5] According to its website, Chicago Legal Clinic is a charitable organization that provides free or low-cost legal services to low-income persons. (*See* http://www.cclaw.org.)

reaching, lifting heavy items, and walking further than two blocks caused her back pain to worsen. (A.R. 325-26.) She testified that she could carry one gallon of milk "from the door to the refrigerator," but could not carry two gallons of milk. (A.R. 326-27.) She also testified that she had pain in her abdomen a few times a day for at least a few minutes. (A.R. 328.) She further testified that she had vision problems, could not see far away, and that her left eye was "completely blurred." (A.R. 329.) She testified to having problems with her wrists and hands, particularly the right one, stating, "It gets tight, it feels, goes numb, and I can't cook or write too long with this hand without it starting to really bother me." (A.R. 329.) She further testified that she often got headaches and that when she did, excessive noise and bright lighting bothered her. (A.R. 335-36.) She explained, "[W]hen I have a headache . . . if I can get somewhere quiet where it's just me and just try and wait [out] the headache." (A.R. 337.)

The ALJ noted that Plaintiff's doctor had ordered additional testing of her hands, back, and eyes, and questioned Plaintiff as to why this testing had not occurred. (A.R. 318, 329.) Plaintiff responded that she did not have a telephone during this period and had given her brother's telephone number as a contact number. (A.R. 330.) She testified that her brother did not convey the information to her about various doctors' appointments that had been scheduled. (A.R. 330.) Plaintiff's attorney testified that Plaintiff had been back to her treating physician on November 14, 2006, the day before the hearing, and that all of the tests had been rescheduled. (A.R. 316-17.)

As for her daily activities, Plaintiff testified that she was currently living at a friend's house, and that in an average day she woke up around 7 a.m. and went to bed around 11 p.m. (A.R. 330.) She testified that she tried to do some cleaning, including vacuuming and "[a] little

4

dusting," and could do some cooking and laundry. (A.R. 330-31.) She had difficulties going to the grocery store and so her friend went for her. (A.R. 331.) She took frequent naps during the day because she did not sleep well at night, in part because of her back pain. (A.R. 331, 337-38.) She testified that she sometimes tried to read a book and often watched television in the evenings. (A.R. 332.) She testified that she went to church every Sunday but otherwise did not go out much. (A.R. 332-33.)

Plaintiff described her past work as a child care worker, which involved caring for three or four children between the ages of one and three. (A.R. 319.) She also previously worked as a "housekeeper," which entailed giving her clients baths, changing their clothing, changing their bedding, cleaning their houses, preparing their meals, and running errands. (A.R. 320.) That job required her to be able to lift more than 50 pounds. (A.R. 320-21.) She also previously performed stockroom and packing work, both of which required her to lift up to 50 pounds. (A.R. 321-23.)

The ALJ questioned Plaintiff about her efforts to find work after she was hospitalized in 2004. (A.R. 333-34.) She testified that she had not worked since then. (A.R. 334.) He asked, "Well, let me ask you this. What about finding a job like a cashier in a . . . store or a [sic], could you do that, you know, not stocking, just cashiering?" (A.R. 334.) Plaintiff responded, "I don't know, I don't, I don't think so because of the trouble I have with standing and sitting too long and . . . a lot of jobs don't allow you to sit." (A.R. 334.) The ALJ then asked, "[W]hat if you had a job where you could sit or stand whenever you wanted to, you didn't have to lift more than 20 pounds on occasion, 10 pounds infrequently, that's a gallon milk, 10 pounds?" (A.R. 334.) Plaintiff responded, "I don't know." (A.R. 334.) The ALJ then asked, "If you could sit, you

5

could stand whenever you wanted to, what about that?" (A.R. 334.) Plaintiff responded, "[I]f I could, could have found one . . . I probably, probably would have tried it." (A.R. 334.)

Vocational expert Cheryl Hoiseth ("the VE") also testified at the hearing. (A.R. 338-43.) The VE testified that, based on the *Dictionary of Occupational Titles* ("DOT"),[6] Plaintiff's past child care work was in the medium exertional level, semi-skilled category; her stock work was in the medium or heavy extertional level, semi-skilled category; and her packing work was in the medium exertional level, unskilled category. (A.R. 338-39.) The VE further testified that although Plaintiff described her past work as a "housekeeper," the VE thought the position was more comparable to that of "home attendant" based on the duties Plaintiff had described. (A.R. 339.) The VE testified that, according to the DOT, the job of "home attendant" is ordinarily performed at a medium exertional level, but "the way the Claimant described it having to bodily lift her clients would put it at the heavy exertional level." (A.R. 339.)

The ALJ then asked the VE to consider the work abilities of a person of Plaintiff's age, education level, and vocational background "who could on occasion lift or carry 20 pounds, could frequently lift or carry 10, could stand, walk or sit for six hours in an eight hour day, but would need to be able to sit or stand at will, has the ability to push or pull 20 pounds. Positions she could do would need to not require her to have excellent vision, good vision and she could engage in frequent, by that I mean two-thirds of the day, fine manipulation with her right upper extremity." (A.R. 340.) The VE testified that such a person could not perform any of Plaintiff's

---

[6] The DOT, published by the U.S. Department of Labor, provides detailed physical requirements for a variety of jobs. *Prochaska v. Barnhart*, 454 F.3d 731, 735 n.1 (7th Cir. 2006). The SSA takes "administrative notice" of the DOT. 20 C.F.R. § 416.966(d)(1); *Prochaska*, 454 F.3d at 735 n.1.

6

past jobs "at the weights that she's talking about." (A.R. 340).

The VE opined that a person with Plaintiff's limitations could perform certain jobs at a light exertion level: hand packager, of which there were 2,000 jobs in the regional economy; "cleaner, housekeeping" jobs, of which there were approximately 14,000 in the regional economy; and "information clerk" jobs, of which there were approximately 4,000 in the regional economy. (A.R. 340-41.) The ALJ asked the VE to consider whether the hypothetical person he had described could perform those jobs if they needed to avoid brightly lit or noisy work areas. (A.R. 341.) The VE testified that such a limitation would rule out the information clerk and hand-packager jobs. (A.R. 342.) Plaintiff's attorney asked the VE whether the hypothetical person could perform any of the jobs identified by the VE if she needed to lie down and rest during the day. (A.R. 343.) The VE responded, "She can't sleep on the job, that's not possible, it would rule out the work." (A.R. 343.)

### III.  ALJ Decision

In a decision issued on December 5, 2006, the ALJ found that Plaintiff was not disabled. (A.R. 23-27.) The ALJ concluded that Plaintiff had a "severe combination of impairments" involving "back pain, headaches, female pelvic inflammatory disease, poor vision in left eye and right wrist pain." (A.R. 25.) Despite these limitations, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to "lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday with the option to sit/stand at will, and push/pull a maximum of 20 pounds." (A.R. 25.) The ALJ further concluded that Plaintiff could "frequently (2/3 of the day) engage in fine manipulation with the use of her right upper extremity," but that due to poor vision, "she should

7

perform work that does not require excellent vision and she must avoid bright lights." (A.R. at 25-26.) The ALJ also determined that due to her frequent headaches Plaintiff needed to avoid "noisy" environments. (A.R. at 26-27.)

In assessing Plaintiff's RFC, the ALJ determined that Plaintiff's testimony was not fully credible because her "complaints of pain exceed the objective medical evidence of record." (A.R. 26.) The ALJ observed that there was "scant" clinical evidence to corroborate Plaintiff's claimed impairments, and noted that her doctor had ordered additional testing, which had not been completed. (Id.) The ALJ stated, "The claimant did not indicate that she followed up with her doctor in an attempt to reschedule any of these examinations or tests. Therefore, there is limited medical evidence of record to support the claimant's contentions of pain and physical limitation." (Id.) The ALJ noted that the one x-ray taken of Plaintiff's spine revealed no abnormalities. (Id.) The ALJ also found that Plaintiff's daily activities undercut her complaints of disabling pain. (Id.)

Although the ALJ did not find Plaintiff's complaints entirely credible, he stated that "in an attempt to give the claimant every benefit of the doubt," he had ascribed an RFC that "fairly considers her subjective allegations of back, wrist and abdominal pain, poor vision, and frequent headaches." (Id.) Based on the Plaintiff's RFC, the ALJ determined that she was capable of performing her "past relevant work as a cleaner/housekeeper." (A.R. 27.) He stated that he was relying on the VE's testimony that although Plaintiff's past work as a housekeeper had been performed at the "medium exertional level," such work is normally performed at a light exertional level. (Id.) The ALJ concluded, "In comparing the claimant's residual functional capacity with the physical demands of cleaning/housekeeping work, the undersigned finds that

8

the claimant is able to perform this work as it is generally performed in the regional economy." (*Id.*) Accordingly, the ALJ denied Plaintiff's application for SSI. (*Id.*)

## IV. New Medical Evidence

Following the ALJ hearing, Plaintiff went for the additional tests her doctor had ordered. As of March 2007, Plaintiff had obtained the results of these tests. An electromyography ("EMG") test performed on February 20, 2007, showed evidence of moderate carpal tunnel syndrome on the right and mild carpal tunnel syndrome on the left. (A.R. 295.) As a result of this test, Plaintiff's doctor diagnosed her with bilateral carpal tunnel syndrome. (A.R. 295.) He referred her to a hand clinic to get bracing on the left wrist in addition to her already braced right wrist, and also referred her to physical therapy. (A.R. 257.) A physical therapist's preliminary report from March 2007 showed no muscle wasting in Plaintiff's wrists and hands, intact sensation bilaterally, with evidence of carpal tunnel syndrome, more pronounced on the right than on the left. (A.R. 297.) Plaintiff opted to continue using splints rather than undergo surgery at that time. (A.R. 297-98.)

Plaintiff also received the results of a computed tomography ("CT") scan of her thoracic spine taken on November 27, 2006, which showed mild disc space loss at two levels. (A.R. 286-87.) An eye examination performed in January 2007 revealed eye abnormalities, including a cataract on the left eye. (A.R. 299.)

Plaintiff requested review of her case by the Appeals Council and submitted the new medical evidence. (A.R. 18, 291-310.) This request for review was denied. (A.R. 4-7.)

## PROCEDURAL HISTORY

In September 2007, Plaintiff filed this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final decision denying her SSI benefits. (R. 7, Compl.) Plaintiff now moves for reversal of the ALJ's decision based on certain errors he committed. (R. 17, Pl.'s Mot. for Summ. J.) Plaintiff alternatively moves for remand so that the ALJ can consider the new medical evidence she obtained following the ALJ hearing. (R. 20, Pl.'s Mot. to Remand.) The Commissioner urges affirmance of the ALJ's decision denying benefits, and also objects to Plaintiff's request for remand based on new evidence.[7] (R. 24, Def.'s Resp.)

## LEGAL STANDARDS

When the Appeals Council declines review, the Court treats the ALJ's ruling as the Commissioner's "final decision." *Prochaska*, 454 F.3d at 734. The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to considerable deference. *Id.* The Court must affirm an ALJ's decision to deny benefits if it is supported by substantial evidence. *Id.* at 734-35. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In reviewing the ALJ's decision, the Court will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Although the Court's review is deferential, the ALJ's decision cannot stand if it contains errors of law, lacks evidentiary support, or lacks an adequate discussion of the issues. *Briscoe v.*

---

[7] Although the Commissioner seeks affirmance of the ALJ's decision in its response to Plaintiff's motions, for unknown reasons the Commissioner has not filed a formal cross-motion for summary judgment.

*Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

## ANALYSIS

Here, the Appeals Council denied Plaintiff's request for review, and therefore this Court treats the ALJ's ruling as the Commissioner's final decision.[8] *Prochaska*, 454 F.3d at 734. A claimant is entitled to disability benefits if found to be disabled within the meaning of the Social Security Act ("the Act"). 42 U.S.C. § 423(a)(1)(E); *Briscoe*, 425 F.3d at 351. The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 219-20 (2002).

The ALJ conducts a five-step sequential analysis to assess whether a claimant is disabled, determining: (1) whether the claimant is presently employed; (2) whether she has a severe impairment; (3) whether her impairment is the equivalent of an impairment listed in the Social Security regulations; (4) whether her residual functional capacity leaves her unable to perform her past relevant work; and (5) whether she is unable to perform any other work existing in

---

[8] The Court agrees with the Commissioner that the Appeals Council's unexplained denial of Plaintiff's request for review is not judicially reviewable. *See Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993) (when the Appeals Council refuses to consider new evidence, "that refusal is not itself a final, appealable order—the administrative law judge's decision is, having been made final and appealable by the refusal"). Had the Appeals Council offered a legally erroneous reason for denying Plaintiff's request for review, that decision would have been reviewable. *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997). But in the absence of any apparent legal error, the Appeals' Council's decision whether to review is discretionary and unreviewable. *Id.* Here, the Appeals Council offered no reason for its denial, as it is permitted to do, and its decision is thus unreviewable. *See Damato v. Sullivan*, 945 F.2d 982, 989 (7th Cir. 1991) ("[T]he Appeals Council may deny review without articulating its reasoning.").

significant numbers in the national economy. *Briscoe*, 425 F.3d at 351-52. The burden of proof lies with the claimant at steps one through four but shifts to the Commissioner at step five. *Id.* at 352.

Here, Plaintiff argues that the ALJ's decision must be reversed because of errors he made in assessing her credibility and in determining at step four that she could perform her past relevant work as a housekeeper. (R. 18, Pl.'s Mem. in Supp. of Mot. for Summ. J.) Alternatively, Plaintiff moves for remand based on the existence of new medical evidence not previously considered by the ALJ. (R. 20, Pl.'s Mot. to Remand.) The Court addresses first Plaintiff's motion to remand based on new medical evidence.

## I.    New Medical Evidence

Sentence six of 42 U.S.C. § 405(g) permits the Court to remand a case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

### A.    New

Evidence is considered "new" for purposes of Section 405(g) if it was "not in existence or available to the plaintiff at the time of the administrative proceeding." *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005). Here, Plaintiff's test results were not in existence or otherwise available to her at the time of the ALJ hearing; the record indicates that Plaintiff underwent the additional testing and obtained the test results following the November 15, 2006, ALJ hearing. (A.R. 292-99.) This case is distinguishable from *Perkins v. Chater*, 107 F.3d 1290 (7th Cir. 1997), cited by the Commissioner. (R. 24, Def.'s Resp. at 10-11.) In that case the "new"

evidence was an evaluation made by the plaintiff's physician following the ALJ hearing but based entirely on medical evidence that was in existence prior to the hearing. *Perkins*, 107 F.3d at 1296. The Seventh Circuit found that this type of "derivative" evidence was not "new" for purposes of Section 405(g): "Even though Dr. Reich's evaluations were technically not in existence at the time of the earlier hearing, he based his conclusions entirely on evidence that had long been available." *Id.* Unlike in *Perkins*, the new evidence in this case consists of clinical tests that were conducted following the ALJ's hearing. Accordingly, the Court finds that the medical evidence satisfies the definition of "new."

## B.     Material

Evidence is considered "material" it there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Schmidt*, 395 F.3d at 742. Further, the evidence must relate to the claimaint's condition "during the relevant time period encompassed by the disability application under review." *Id.* Thus, medical records that post-date the ALJ's hearing and that "speak only to the applicant's current condition, not to his condition at the time his application was under consideration by the Social Security Administration" are not considered material. *Id.; see also Murphy v. Barnhart*, 417 F. Supp. 2d 965, 973 (N.D. Ill. 2006).

Here, the Commissioner concedes that the CT scan of Plaintiff's spine, conducted only a few weeks after the ALJ hearing, meets the definition of material in that it encompasses the time period under review by the ALJ. (R. 24, Def.'s Resp. at 11.) As to the other new evidence, the Commissioner argues that this evidence is not material because at most it demonstrates a deterioration of Plaintiff's physical condition following the ALJ hearing. (*Id.* at 11-12.) The

13

Court disagrees. The other medical evidence—an eye examination revealing vision impairments, an EMG test report showing evidence of moderate carpal tunnel syndrome, and treatment records—post-date the ALJ's decision by three months or less, and document impairments of which Plaintiff had been complaining for years. Given the minimal lapse of time between the testing and the ALJ's decision, the Court concludes that the additional medical evidence meets the definition of "material." *See Sears v. Bowen*, 840 F.2d 394, 400-01 (7th Cir. 1988) (new evidence was material even though report was made more than a year after ALJ hearing, where treatment began one month after the ALJ hearing and report indicated that plaintiff's psychiatric problems were long-standing); *compare with Schmidt*, 395 F.3d at 742 (new medical records not material where they documented plaintiff's condition as it existed one to three years after the ALJ rendered his decision); *Godsey v. Bowen*, 832 F.2d 443, 444-45 (7th Cir. 1987) (claimant not entitled to remand based on new evidence documenting her condition three years after administrative hearing).

Moreover, the Court finds a reasonable probability that the ALJ would have reached a different conclusion if the new evidence had been before him. In assessing Plaintiff's RFC, the ALJ found her complaints of pain and claimed physical limitations only partially credible, in part due to what he viewed as the "scant" clinical evidence to support her claimed impairments. (A.R. 26.) The new medical evidence fills certain gaps in the record that concerned the ALJ, and provides documentation of specific impairments in Plaintiff's back, eyes, and hands, lending support to her subjective complaints of pain and physical limitations. Under these circumstances, the Court finds this new evidence material. *See Nelson v. Bowen*, 855 F.2d 503, 507-08 (7th Cir. 1988) ("Given the paucity of the evidence before the ALJ relevant to this issue

14

and the lack of evidence clearly contradicting the additional evidence offered by [claimant] . . . that evidence, if considered by the ALJ, might reasonably have affected his determination that [claimant] could stand and walk for the periods required for a finding he was capable of light work."); *Stubbs v. Apfel*, No. 97-7069, 1998 WL 547107, at *10 (N.D. Ill. Aug. 20, 1998) (new clinical evidence material where it documented impairment "given the fact that the ALJ found incredible Claimant's testimony regarding the degree and severity of the pain and limitations she alleges to suffer"); *Brown v. Chater*, 913 F. Supp. 1210, 1217 (N.D. Ill. 1996) (finding new evidence material where doctor's letter diagnosing claimant with rheumatoid arthritis could have altered ALJ's decision, "especially regarding the credibility he gave to [claimant's] subjective complaints"); *Kindred v. Heckler*, 595 F. Supp. 563, 567 (N.D. Ill. 1984) (new medical evidence consisting of a CT scan report and physician's report was material, as there was a "reasonable possibility such strong evidence of the continuation and worsening of [the claimant's] condition may alter the Secretary's determination").

The Commissioner argues that the ALJ already "largely credited" Plaintiff's subjective complaints and thus would not reach a different conclusion after reviewing the new medical evidence. (R. 24, Def.'s Resp. at 11.) The Court disagrees with this characterization of the record. Although the ALJ stated that he wanted to give Plaintiff "every benefit of the doubt" and had "fairly consider[ed]" her subjective complaints of pain in determining her RFC, it is clear that he did not credit all of her testimony about her physical limitations. (A.R. 26.) Indeed, the ALJ's RFC assessment directly conflicts with Plaintiff's testimony that, among other things, she could carry 10 pounds only a short distance, could not carry 20 pounds, could not use her right hand for extended periods, and had to lie down and rest frequently during the day. (A.R. 325-

15

37.) As stated above, in assessing the Plaintiff's RFC, the ALJ was concerned about the dearth of clinical evidence to support Plaintiff's subjective complaints. (A.R. 26-27.) The new medical evidence documents impairments and lends support for Plaintiff's claimed limitations. For these reasons, the Court concludes that the new medical evidence is "material."

## C.     Good Cause

Last, the Court must determine whether Plaintiff had good cause for not obtaining the medical evidence prior to the ALJ's decision. In that regard, the record reflects as follows. Plaintiff is a person of limited means who receives medical treatment through a publicly funded county clinic. (A.R. 256, 257, 286-87.) Plaintiff takes medication for depression. (A.R. 192.) Plaintiff did not complete the additional tests ordered by her treating physician prior to the ALJ hearing because she did not have a telephone during this period, and her brother did not give her the messages about doctor's appointments that had been scheduled. (A.R. 317, 330-31.) She nonetheless returned to her treating doctor some months later, still complaining of pain, and the tests were rescheduled. (A.R. 256, 317.) Following the ALJ hearing, Plaintiff went to all the scheduled appointments and completed the additional testing, which revealed specific impairments that supported the subjective complaints Plaintiff had been making for almost two years. In the words of the Seventh Circuit, "This record and these facts convince us that this is not a case of 'sandbagging' by a claimant who loses and hopes to get another chance at obtaining benefits by bringing in new evidence." *Sears*, 840 F.2d at 400.

The Commissioner argues that Plaintiff cannot establish good cause for failing to submit the evidence earlier, because she should have requested a continuance of the ALJ hearing or sought additional time to submit the test results to the ALJ post-hearing. (R. 24, Def.'s Resp. at

10-11.) Although it is unknown why Plaintiff's attorney did not request such relief (she is being represented by a different attorney in this action), the Commissioner has not cited any authority, nor is this Court aware of any, holding that Section 405(g) imposes an obligation on claimants to exercise either of these options in order for a remand to be warranted based on new evidence. Instead, this Court agrees with the District Court in *Stubbs* that "[t]he good cause requirement is indicative of congressional intent to prevent bad faith manipulation of the administrative process," *Stubbs*, 1998 WL 547107, at *11, and here the Court finds no such manipulation. Further, although a claimant bears the burden of supplying adequate evidence to prove a claim of disability, 20 C.F.R. § 404.1512(c), the ALJ has his own obligation to develop a "full and fair" record in order to accurately assess the claim of disability. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). The record demonstrates that the ALJ was aware that the additional clinical tests had been rescheduled, but for unknown reasons he did not suggest that the hearing be continued, nor did he give Plaintiff time to submit the test results post-hearing.[9]

Given the unique circumstances of this case, the Court finds good cause for Plaintiff's failure to submit the medical records prior to the ALJ's decision. *See, e.g., Sears*, 840 F.2d at 399-400 (finding good cause for plaintiff's failure to submit medical evidence based on combination of factors, including plaintiff's psychiatric history, his vision problems and reliance on others to read and explain notices to him, and fact that he was represented by lay advocates "whose endeavors obviously left much to be desired"); *Ferguson v. Astrue*, ---F. Supp.2d---,

---

[9] To the extent the ALJ concluded in his opinion that there was no evidence Plaintiff had rescheduled any of the tests as of the time of the hearing (*see* A.R. 26), this conflicts with the testimony of Plaintiff's attorney, who testified that Plaintiff had been to her treating physician the day before the hearing and that the tests had been rescheduled. (A.R. 316.)

17

2008 WL 857201, at *14 (E.D. Wis. Feb. 6, 2008) (finding good cause for plaintiff's failure to submit evidence where plaintiff was a low-income person with a history of depression who could not afford to pay for medical evaluation prior to hearing but was able to obtain evaluation at a reduced rate following the ALJ hearing); *Stubbs*, 1998 WL 547107, at *11 (finding good cause where facts demonstrated no bad faith manipulation of administrative process by the plaintiff).

As the Plaintiff has satisfied the criteria for a remand under sentence six of Section 405(g), the Court will remand the case for consideration of Plaintiff's new medical evidence. For the sake of completeness, the Court finds it necessary to consider Plaintiff's remaining two arguments for reversal and remand pursuant to sentence four of Section 405(g). *See Richmond v. Chater*, 94 F.3d 263, 268-69 (7th Cir. 1996) (explaining that "sentence six" remand is authorized where there is new medical evidence, whereas "sentence four" remand is authorized where district court modifies or reverses agency's decision due to errors).

## II. Past Relevant Work

In arguing for reversal of the agency's decision, Plaintiff argues that the ALJ erred in determining that she could return to her past relevant work as a housekeeper. (R. 18, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 9-10.) Based on the evidence, the ALJ found that Plaintiff had the RFC to: lift or carry 20 pounds occasionally, and ten pounds frequently; stand or walk for six hours out of an eight-hour workday, with the option to sit or stand at will; push or pull up to 20 pounds; and frequently engage in fine manipulation with her right upper extremity. (A.R. 25). These findings represent a limited range of light work. SSR 83-10. The ALJ also found that Plaintiff should avoid work that required excellent vision or subjected her to bright lights or a "noisy" environment. (A.R. 25-26). In determining that Plaintiff could perform her past relevant

work as a housekeeper notwithstanding her impairments, the ALJ stated that he was relying on the VE's testimony that Plaintiff's past work as a housekeeper was "generally performed at the light exertional level." (A.R. 27.)

Contrary to the ALJ's statement, the VE testified that Plaintiff's past work as a "housekeeper" was the equivalent of "home attendant," which is typically performed at the *medium* exertional level, but that Plaintiff had been performing it at the *heavy* exertional level. (A.R. 340). The VE concluded that a person with Plaintiff's impairments could not perform that work.[10] (A.R. 340.) In apparent disregard of the VE's testimony, the ALJ determined that Plaintiff could perform her "past relevant work" as a "cleaner/housekeeper." (A.R. 27.)

The Commissioner concedes that the ALJ erred in equating the job entitled "cleaner/ housekeeping" with the position of "housekeeper" as used by Plaintiff, but argues that this error was harmless, because the VE correctly identified the jobs and the appropriate exertion level for which Plaintiff qualifies. (R. 24, Def.'s Resp. at 7.) The Commissioner is essentially asking the Court to conduct its own step five analysis, even though the ALJ only reached step four of the sequential evaluation. The distinction between step four and step five is not insignificant, since once a claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy. *Briscoe*, 425 F.3d at 352. Moreover, principles of agency law limit this Court's ability to affirm based on *post hoc* rationalizations by the Commissioner's lawyers. "[R]egardless [of]

---

[10] According to the Social Security Regulations, medium work requires the ability to frequently lift and carry 25 pounds and occasionally lift and carry 50 pounds. SSR 83-10. This is well beyond the RFC determined by the ALJ. (A.R. 340).

19

whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). "That is why the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion." *Id.* Here, the Court finds such a bridge lacking, given the apparent conflict between the VE's testimony and the ALJ's ultimate conclusion that Plaintiff could perform her past relevant work.

Although the Commissioner is correct that harmless error analysis applies to review of an ALJ's decision, here the Court does not find it "plain . . . that the [ALJ's] factual determinations would compel a denial of benefits" in any event.[11] *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). This is particularly true given the new medical evidence Plaintiff has obtained. Indeed, it appears likely that the RFC assessment may change altogether in light of the new medical evidence. Plaintiff's testimony about her pain and functional limitations conflicted with the ALJ's determination that, among other things, she can lift 20 pounds occasionally and 10 pounds frequently or engage in frequent fine manipulation with her right hand. (A.R. 25, 325-29.) The ALJ only partially credited Plaintiff's testimony in significant part because there was little clinical evidence documenting Plaintiff's impairments. (A.R. 26.) Plaintiff has now obtained the

---

[11] For instance, there is an apparent conflict as to whether the noise level associated with "cleaner/housekeeper" jobs would preclude Plaintiff from performing that work. The ALJ determined that the Plaintiff should avoid "noisy" environments, but according to the DOT, the noise level associated with the "cleaner/housekeeping" job is listed as "Level 3 - Moderate." (R. 24-2, Def.'s Resp., Ex. A.) This issue was not explored at the hearing, and it is not clear from the record whether this level of noise is equivalent to a quiet environment. Whether there is a conflict between the VE's testimony and the DOT job descriptions, and whether the Plaintiff can perform the jobs identified by the VE in light of her impairments, are issues that must be explored by the ALJ in the first instance. *Prochaska*, 454 F.3d at 735-36.

20

type of clinical evidence the ALJ found lacking. In light of these circumstances, the Court cannot employ a harmless error analysis to affirm the denial of benefits, and instead concludes that the case must be remanded for further proceedings. The Court leaves to the ALJ to determine in the first instance whether, based on her impairments, Plaintiff has the RFC to perform her past relevant work or other work that exists in the economy.

## III.    Credibility

Plaintiff additionally argues that the ALJ erred in making an adverse credibility determination. (R. Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13-14.) An ALJ's credibility determination deserves "considerable deference" and may be overturned only if it was "patently wrong." *Prochaska,* 454 F.3d at 738. Nevertheless, the ALJ must articulate specific reasons for discounting a claimant's testimony as less than credible, and cannot simply ignore testimony or rely on an apparent conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding. SSR 96-7p; *Schmidt,* 395 F.3d at 746-47. Further, the ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Murphy,* 417 F. Supp. 2d at 972.

Here, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of her pain were not entirely credible. (A.R. 26.) As discussed above, the ALJ stated that he was basing this determination on the lack of clinical evidence to substantiate Plaintiff's claimed impairments. (A.R. 26.) The ALJ considered the medical evidence as it existed in the record, and also considered Plaintiff's account of her daily activities. (A.R. 26.) The ALJ did not ignore any testimony or medical evidence. The ALJ adequately considered the

21

relevant factors in making his credibility determination, and the Court finds no basis on which to conclude that the ALJ's credibility determination was patently wrong. While there is new medical evidence that detracts from the ALJ's conclusions, the ALJ "cannot be faulted for having failed to weigh evidence never presented to him." *Eads*, 983 F.2d at 817.

Notably, although there is no basis on the present record to conclude that the ALJ's credibility determination was patently wrong, the new medical evidence fills some of the gaps that concerned the ALJ when he decided to partially discount Plaintiff's testimony. On remand, the ALJ can give full reconsideration to Plaintiff's credibility in light of the new medical evidence documenting her impairments.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (R. 17) is granted in part and denied in part. Plaintiff's motion for a remand (R. 20) is granted. This case is reversed and remanded to the ALJ for further proceedings consistent with this opinion.

ENTERED:

**Ruben Castillo**
**United States District Judge**

**Date: May 5, 2008**

22